## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | **14-CR-20735-001** |
| Plaintiff, | |
| v. | **ORDER DENYING DEFENDANT'S PRO SE MOTION TO AMEND SENTENCE TO HOME CONFINEMENT (ECF NO. 31) BUT GRANTING DEFENDANT'S REQUEST FOR COMPASSIONATE RELEASE** |
| **JAJUAN OMAR GARDNER**, | |
| Defendant. | |

Before the Court is Defendant JaJuan Omar Gardner's Motion to Amend Sentence to Home Confinement, dated April 9, 2020, and received by the Court on May 4, 2020. ECF No. 31. In addition to a response from the Government (ECF No. 33), the Court considers a supplemental brief filed on behalf of Mr. Gardner following the Court's limited appointment of a federal community defender to provide such supplement (ECF No. 39), as well as a supplement provided by Mr. Gardner personally from prison (ECF No. 41), an updated release plan (ECF No. 44) and a sur-reply from the Government (ECF No. 46). For the reasons stated herein, the Court the Court **DENIES** Defendant's motion for home confinement, because it does not have the authority to order the United States Bureau of Prisons ("BOP") to place Mr. Gardner on home confinement but

1

**GRANTS** Defendant's request for compassionate release, **ORDERS** that Defendant's sentence of imprisonment is reduced to time served and **ORDERS** that Mr. Gardner immediately begin serving his originally imposed four (4) year term of supervised release. Judgment, ECF No. 29, PageID.129. As a condition of supervised release, Mr. Gardner must participate in the Global Positioning Satellite (GPS) technology of the Location Monitoring Program for a minimum of 180 consecutive days and abide by all the requirements of the program. Mr. Gardner is restricted to his residence, according to a curfew as directed by the probation officer. After 180 days, the probation department will notify the Court and determine if the Location Monitoring Program needs to be continued.

## I. Background

### A.   Factual Background

On February 20, 2019, the Court sentenced Defendant JaJuan Gardner to 52 months in the custody of the Bureau of Prisons ("BOP") for his violation of 21 U.S.C. § 841(a)(1), 21 U.S.C. § 841(b)(1)(B), possession with intent to distribute cocaine base. Despite an anticipated Guideline Range of 188-235, the Court sentenced Mr. Gardner to 52 months. Gardner began serving his sentence on July 18, 2019 and has served less than half of his sentence. Mr. Gardner's projected release date is March 25, 2022 and he is eligible for home detention on October 19, 2021. ECF No 41, PageID.243.

Mr. Gardner is a 50-year-old African American man who seeks release due to a history of hypertension/high blood pressure, a heart condition (abnormal EKG findings and two stents), and coronary disease with angina. ECF No. 41, PageID.191. Mr. Gardner also seeks release due to a diagnosis of stage-two kidney disease, hyperlipidemia, lumbar disc disease, lumbar herniation, spinal cord impingement, an artificial knee joint, an artificial shoulder cup, and sickle cell trait. *Id.* These conditions predate his incarceration, some of which were the basis for several delays in Mr. Gardner's sentencing hearing. *See* ECF Nos. 16-24 (delaying sentencing from June 30, 2016 to January 24, 2019).

## B.    COVID-19

The novel coronavirus disease of 2019, COVID-19, is a respiratory illness that is thought to spread mainly from person to person through respiratory droplets produced when an infected person coughs or sneezes. *See* Frequently Asked Questions, Centers for Disease Control and Prevention Coronavirus (May 5, 2020) https://www.cdc.gov/coronavirus/2019-ncov/faq.html#How-COVID-19-Spreads.    Because    the    virus-carrying droplets can land in the mouths or noses of people who are nearby or can be inhaled into the lungs, spread is more likely when people are in close contact with one another (within about six feet). *Id.*

The CDC also indicates that certain classes of individuals are at higher risk of developing severe illness if exposed to COVID-19, including "[p]eople who have serious heart conditions[,]" and "[p]eople who are

immunocompromised[,]" and "[p]eople with chronic kidney disease undergoing dialysis[.]" People Who Are at Higher Risk for Severe Illness, Centers for Disease Control and Prevention (May 14, 2020) https://www.cdc.gov/coronavirus/2019-ncov/need-extraprecautions/people-at-higher-risk.html.

Likewise, the CDC has issued guidance acknowledging that detention facilities "present [] unique challenges for control of COVID-19 transmission among incarcerated/detained persons, staff, and visitors." Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities (May 7, 2020) https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html. "The CDC noted that many detention conditions create a heightened risk [for] detainees. These include: low capacity for patient volume, insufficient quarantine space, insufficient on-site medical staff, highly congregational environments, inability of most patients to leave the facility, and limited ability of incarcerated/detained persons to exercise effective disease prevention measures (e.g., social distancing and frequent handwashing)." *United States v. Kennedy*, No. 18-20315, 2020 WL 1493481, at *2 (E.D. Mich. Mar. 27, 2020). Indeed, "[w]hile the COVID-19 pandemic is devastating in every region it invades, prison populations are subject to heightened vulnerability." *Howard v. United States*, No. 16-cr-20222, 2020 WL 2615509, at *2 (E.D. Mich. May 22, 2020) (citing Danielle Ivory, *"We Are*

4

*Not a Hospital": A Prison Braces for the Coronavirus*, N.Y. Times (Mar. 17, 2020), https://www.nytimes.com/2020/03/17/us/coronavirus-prisons-jails.html (citing densely populated living conditions, shortage of masks, soap, and hand sanitizer, and the inability to routinely disinfect surfaces and maintain safe distances between inmates and guards as reasons prisoners are at increased risk of infection); *See, e.g.*, Courtney Bublé, *Federal Prisons Pose 'Imminent Danger' in Spreading COVID-19, Union Says*, Government Executive (April 6, 2020), https://www.govexec.com/oversight/2020/04/federal-prisons-pose-imminent-danger-spreading-covid-19-union-says/164390/ (detailing a prison workers' union complaint to OSHA complaining of "imminent danger" due to the BOP's failure to follow national safety guidelines)).

## C.   FCI Morgantown

Mr. Gardner is currently serving his sentence at the Federal Correctional Institution ("FCI") in Morgantown, West Virginia. The BOP website does not list FCI Morgantown as one of its facilities with active COVID-19 cases, and the Government states that there are no confirmed cases at the facility. But, as two courts in this district has already explained about FCI Morgantown, the prison's report of zero confirmed cases is more likely a result of a lack of testing than a lack of the virus' presence in the prison. *Segars v. United States*, No. 16-20222-3, 2020 WL 3172734, at *3–4 (E.D. Mich. June 15, 2020); *United States v. Agomuoh*, No 16-20196, 2020 WL 2526113, at *2-3 (E.D. Mich. May 18, 2020).

Especially since the county where the prison is located is currently reporting 129 confirmed cases and 5 deaths, the Court is concerned that inmates and staff members are interacting with one another as normal and may well be unaware as the virus is spreading throughout the prison during its asymptomatic phase. *Coronavirus Disease 2019*, WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN RESOURCES, https://dhhr.wv.gov/COVID-19/Pages/default

.aspx (last visited June 11, 2020). Another court in our district recently found the following about the conditions at FCI Morgantown:

> Mr. Agomuoh has been transferred within the prison and now has a new roommate. They're sleeping within ten feet of each other. They're eating elbow to elbow ... There's no medical treatment after 5:00 PM. He would have to wait until the next day. There's usually—he reports only one doctor on staff with a handful of nurses for the population of I believe almost 700. (Tr. Pgs. 5-6.) The United States did not dispute this description of current conditions at FCI Morgantown. There are currently no confirmed cases of COVID-19 at FCI Morgantown, though it is not clear whether the facility is conducting widespread COVID-19 tests for inmates or staff. *United States v. Agomuoh*, No. 16-20196, 2020 WL 2526113, at *2–3 (E.D. Mich. May 18, 2020).

*Segars v. United States*, No. 16-20222-3, 2020 WL 3172734, at *3–4 (E.D. Mich. June 15, 2020) (quoting *United States v. Agomuoh*, No 16-20196, 2020 WL 2526113, at *2-3 (E.D. Mich. May 18, 2020)). After these opinions were issued, the BOP began reporting how many prisoners have

been tested at each of its facilities. These statistics confirm the court's concerns. As of July 20, 2020, only 23 prisoners have been tested for COVID-19 at FCI Morgantown, with four confirmed positive tests and zero pending tests. https://www.bop.gov/coronavirus/. As COVID-19 can be spread by individuals who are asymptomatic or pre-symptomatic, the virus could be spreading in plain sight.

## II. Discussion

### A.    Release to Home Confinement

Mr. Gardner's motion requests that the Court amend his sentence of incarceration and place him on home confinement for the remainder of his sentence. ECF No. 31. While the CARES Act has temporarily permitted the Attorney General to "lengthen the maximum amount of time for which [it] is authorized to place a prisoner on home confinement" under 18 U.S.C. § 3642(c), the authority to make this determination is squarely allocated to the Attorney General, who supervises the Bureau of Prisons. Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), § 12003(b)(2) (enacted Mar. 27, 2020). Therefore, this Court has no power to order that Mr. Gardner serve the remainder of his sentence on home confinement.

The Government's response appears to construe Mr. Gardner's motion as a motion for compassionate release, under the First Step Act, 18 U.S.C. § 3582(c)(1)(A), which predates the CARES Act, presumably with the understanding that the Court cannot order the BOP to have Mr.

Gardner serve the remainder of his sentence on home confinement. Mr. Gardner's reply brief asserts both a request for home confinement and compassionate release. ECF No 41, PageID.191. Therefore, the Court will also consider whether Mr. Gardner is entitled to compassionate release under the First Step Act of 2018.

## B.   Compassionate Release

Criminal defendants may move for compassionate release pursuant to 18 U.S.C. § 3582, as amended by the First Step Act of 2018:

> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in sections 3553(a) to the extent they are applicable, if it finds that—
>> (i) extraordinary and compelling reasons warrant such a reduction.

18 U.S.C. § 3582(c)(1)(A)(i). In applying this provision, two key questions arise. The first is whether the defendant has exhausted his or her administrative remedies. The second is whether, after considering both the extraordinary and compelling reasons, as well as the sentencing factors under 18 U.S.C. § 3553 and whether the release of the defendant

would create a danger to the community, there are good grounds to warrant a reduction of the defendant's sentence.

Application Note 1 to U.S.S.G. § 1B1.13 states in pertinent parts that extraordinary and compelling reasons exist when:

(A) Medical Condition . . .

(ii) The defendant is – (I) suffering from a serious physical or medical condition, (II) suffering from a serious functional or cognitive impairment, or (III) experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

 - -

(D) Other Reasons. – As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

Mr. Gardner contends that his medical conditions paired with the serious and heightened risks posed by the COVID-19 crisis in a prison setting present "other reasons" warranting compassionate release.

### i.    Exhaustion

Pursuant to the Sixth Circuit's recent decision in *United States v. Alam*, a defendant must exhaust administrative remedies *before* moving for compassionate release. --- F.3d ---, No. 20-1298, 2020 WL 2845694, at *1 (6th Cir. June 2, 2020). In *Alam*, a federal prisoner sought compassionate release ten days after requesting relief from his prison

warden, but before he learned of any response from the warden or waiting the statutorily mandated 30 days. 18 U.S.C. § 3582(c)(1)(A). The Sixth Circuit affirmed the district court's dismissal without prejudice. Here, Mr. Gardner moved for compassionate release on April 9, 2020, but the Clerk's Office did not docket the motion until May 4, 2020. ECF No. 31. The Court appointed counsel for Mr. Gardner to assist him in supplementing his original motion, and by the time supplemental briefing was completed, Mr. Gardner had filed a request for relief with the BOP on April 22, 2020 and received a denial on May 28, 2020. ECF No. 41, PageID.239-40. Evidence of Mr. Gardner's exhaustion was not docketed until June 23, 2020. *Id.* Therefore, Mr. Gardner has exhausted his administrative appeals, but his request and denial were received *after* Mr. Gardner filed his motion on April 9.

Under a strict reading of *Alam*, Mr. Gardner's motion for compassionate release should be denied without prejudice so that he can refile his motion. Such a course is ridiculous, however, because Mr. Gardner would be able to *immediately* refile his motion because his request with the BOP has *already been denied*. This remedy seems antithetical to the timely processing of these emergency requests and would only further delay Mr. Gardner's request. Additionally, the Government's response does not challenge the Court's authority to hear Mr. Gardner's motion for compassionate release and does not argue that Mr. Gardner has failed to exhaust his administrative remedies.

Therefore, the Court will take notice of the fact that Mr. Gardner has in fact exhausted his administrative remedies and will consider the merits of Mr. Gardner's request for compassionate release.

### ii.   Extraordinary and Compelling Reasons

### a.   The BOP's Consideration of U.S.S.G. § 1B1.13

The Sentencing Commission provides a policy statement regarding sentencing reductions under § 3582(c)(1)(A). That statement, contained in U.S.S.G. § 1B1.13, has not been updated since § 3582(c)(1)(A) was amended in 2018. Consequently, 1B1.13 speaks only to more restrictive criteria for seeking a reduction in sentence—i.e., a motion brought by the BOP where the defendant is "suffering from a terminal illness," or "experiencing a serious deterioration in physical or mental health because of the aging process." § 1B1.13(A)-(B). Therefore, the policy statement does not reflect motions like the instant one—brought by a defendant on the grounds of high risk of severe illness and/or death as a result of COVID-19. *See United States v. Redd*, 1:97-cr-00006-AJT, 2020 WL 1248493, at *6 (E.D. Va. Mar. 16, 2020) ("[T]here does not currently exist, for purposes of satisfying the First Step Act's 'consistency' requirement, an 'applicable policy statement.'"); *Id.* at n.11 (collecting cases). *But see United States v. Saldana*, 807 Fed.Appx. 816 (Mar. 26, 2020) (unpublished).

Application Note 1 to § 1B1.13 defines "extraordinary and compelling reasons," as encompassing "other reasons" beyond those

enumerated in subdivisions (A) through (C); in other words, where "there exists in the defendant's case an extraordinary and compelling reason *other than*, or *in combination with*, the reasons described in subdivisions (A) through (C). Therefore, "extraordinary and compelling reasons" can exist from the "medical condition of the defendant" other than a terminal illness or age-related debilitating condition. *See United States v. Jackson*, No. 08-20150-02-JWL, 2020 WL 2812764, at *3 (D. Kan. May 29, 2020) ("In including the catchall provision [provision D], the Sentencing Commission clearly intended that the necessary "extraordinary and compelling reasons" not be limited to the examples explicitly set forth in subdivisions (A) through (C) (although those circumstances should be instructive)."); *United States v. Guzman Soto,* No. 1:18-cr-10086-IT, 2020 WL 2104787, at *3 (D. Mass. May 1, 2020) ("[T]he Attorney General, in giving direction to the Director of the Bureau of Prisons, has recognized that COVID-19 is an extraordinary and compelling factor which may be considered, alongside other factors, when determining whether home confinement is merited for certain prisoners."). And here, the COVID-19 pandemic, when combined with medical conditions known to exacerbate the risk of substantial injury or death, is an extraordinary and compelling factor which may be considered. *See Miller v. United States*, No. 16-20222, 2020 WL 1814084, at *3 (E.D. Mich. Apr. 9, 2020) ("Miller has presented 'Other Reasons' in combination with his serious medical conditions to warrant compassionate release.").

### b.    Defendant's high risk of severe illness and/or death from COVID-19

Mr. Gardner's medical conditions are well-documented. Mr. Gardner reports a number of serious medical issues, many of which the Government does not dispute. Indeed, defense counsel at sentencing specifically asked for a downward variance because of the severity of Mr. Gardner's medical issues. Mr. Gardner's Presentencing Report ("PSR") indicates that in 2013 he was diagnosed with high blood pressure while being treated for chest pains. In November 2014, he underwent a heart catheterization and had a stent inserted in an artery. In 2015 he had a stroke requiring another surgical procedure to his heart. In 2015, Mr. Gardner was also involved in a serious car accident where his vehicle was struck by three trucks and he had to be cut from his vehicle. He had surgery to his spine and back, received a knee replacement, and additional surgery to his left hand.

A 2016 letter from Dr. Christina Clark, attached to Mr. Gardner's original sentencing memorandum, verifies that Mr. Gardner has a history of serious illnesses, specifically noting hypertension, coronary artery disease with angina, hyperlipidemia, lumbar disc disease with previous laminectomy and radiculopathy. ECF No. 41, PageID.233. He also has high blood pressure that "has continued to be very challenging to control" and is accompanied by "episodes of chest pain." *Id.* Dr. Clark indicated that "Mr. Gardner requires close follow-up on a monthly basis

with cardiology." *Id.* It is clear that Dr. Clark had serious concerns with Mr. Gardner's health and even made a point to explain that his "*health would be significantly compromised by any prolonged imprisonment.*" *Id.* (emphasis added).

In a supplement[1] filed on June 23, 2020, Mr. Gardner provides the Court with additional medical records regarding treatment received during his incarceration. Those records indicate an ER visit in August 2019, noting that Mr. Gardner has "severe hypertension," and was complaining of chest pain and shortness of breath. ECF No. 41, PageID.210. A CT scan was completed, and doctors at the ER reviewed Mr. Gardner's July 2019 EKG results. Those notes also indicate that Mr. Gardner was prescribed some medications, but that he refused to take some of them, claiming they made him sick. *Id.* August 7, 2019 notes also indicate that Mr. Gardner's hypertension and high blood pressure have been "uncontrolled" or difficult to control with medication. *Id.* at PageID.214.

The CDC states that people with serious heart conditions, such as heart failure or coronary artery disease "are at increased risk of severe illness from COVID-19." *Groups at Higher Risk for Severe Illness*, CENTERS FOR DISEASE CONTROL AND PREVENTION

---

[1] Mr. Gardner's pro se advocacy in support of home confinement and compassionate release have been helpful to the Court. Mr. Gardner generated his own home release plan and provided the Court with evidence of his medical issues and exhaustion with the BOP.

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/ groups-at-higher-risk.html (last updated June 25, 2020). It is clear from Mr. Gardner's medical records that he has a documented history of coronary artery disease. ECF No. 41, PageID.221; PageID.233. In addition, Mr. Gardner's risks also include his documented history of hypertension and high blood pressure. His high blood pressure remains uncontrollable in prison; indeed, in Mr. Gardner's supplement to the Court, counsel noted that Mr. Gardner recently had to be taken to the hospital because his blood pressure was 239/119. ECF No. 44, PageID.260. As of June 25, 2020, the CDC recognizes that individuals with hypertension or high blood pressure "might be at an increased risk for severe illness from COVID-19." https://www.cdc.gov/corona virus/2019-ncov/need-extra-precautions/ groups-at-higher-risk.html (last updated June 25, 2020). And further still, Mr. Gardner suffers from stage-2 kidney disease, and the CDC now states that chronic kidney disease will put a person at higher risk. *Id.*

Even assuming that each of Mr. Gardner's conditions independently do not fit the CDC's definition of severity, "his conditions still exacerbate each other, placing him in a much more vulnerable position than a healthy person, if he were to get COVID-19." *Howard v. United States*, No. 16-20222-2, 2020 WL 2615509, at *3 (E.D. Mich. May 22, 2020) (citing Wei-jie Guan et al., *Comorbidity and its impact on 1590 patients with COVID-19 in China: a nationwide analysis*, 55 EUROPEAN

RESPIRATORY J. (2020) ("Among laboratory confirmed cases of COVID-19, patients with any comorbidity yielded poorer clinical outcomes than those without. A greater number of comorbidities also correlated with poorer clinical outcomes . . . (8.2%) patients reported having two or more comorbidities." The most common comorbidity was hypertension, followed by diabetes.)).

In sum, Mr. Gardner suffers from a number of medical illnesses, some of which are identified by the CDC as exacerbating the risk of serious injury or death if the individual contracts COVID-19 (i.e., heart disease and hypertension). An outbreak of COVID-19 in FCI Morgantown would likely have fatal consequences for Mr. Gardner. And FCI Morgantown's lack of testing is troublesome given the rate at which the virus can spread amongst asymptomatic and pre-symptomatic individuals. *See Segars*, 2020 WL 3172734, at *3–4. Therefore, Mr. Gardner's health conditions are sufficiently serious to satisfy the medical criteria for a reduction in sentence under subsections (A) and (D) of § 1B1.13. *See United States v. Williams*, Case No. 04-cr-95/MCR, at *7 (N.D. Fla. Apr. 1, 2020) ("[A]n outbreak of COVID-19 in Williams' facility would likely have fatal consequences for him. Based on these facts, the Court finds that Williams' deterioration in physical health is sufficiently serious to satisfy the medical criteria for a reduction in sentence.").

Considering the totality of the circumstances of Mr. Gardner's serious health problems, the Court finds that extraordinary and

compelling reasons exist that would be sufficient to justify compassionate release.

### iii.   Danger to the Community

But a finding that extraordinary and compelling reasons exist does not complete the inquiry on the question of whether to grant compassionate release. Federal Sentencing Guideline § 1B1.13 provides for compassionate release only when "[t]he defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." First, while the Court recognizes that the BOP has classified Mr. Gardner as having a medium risk of recidivism, ECF No. 33, PageID.148, there is evidence in the record suggesting that recidivism is unlikely.  Despite some parole or probation violations from more than 15 years ago, the Presentence Report noted that since 2007, Mr. Gardner had no serious criminal convictions prior to the instant case.  He also demonstrated a multi-year compliance with pretrial supervision during the pendency of this case. The offense occurred in 2014, but Gardner was released initially pending further investigation, and not charged until two years later, with no other criminal activity since his arrest. Moreover, after appearing on these charges in federal court, Mr. Gardner was released on bond by the Magistrate Judge.  By releasing him, the Magistrate Judge thus found, at a point in time much closer to the defendant's commission of the charged crime, that Mr. Gardner did *not* constitute a danger to the community. There is no reason for the Court

to assume that Mr. Gardner presents a greater danger now, six years after the offense and following service of a prison sentence, than he did when he was released on bond. Also weighing against a finding of dangerousness is the fact that, while incarcerated, Mr. Gardner has demonstrated an initiative for improvement and pro-social behavior by completing several courses in prison, including a cognitive behavioral therapy class, a welding class, a drug program, and a faith-specific reentry program. ECF No. 31, PageID.137-38.

Mr. Gardner has also provided a release plan that states he would live with his longstanding partner, Sharon Robinson, three children, and one grandchild in Flint, Michigan. ECF No. 41, PageID.192; ECF No. 44. In an affidavit provided by Ms. Robinson, she states that she agrees to have Mr. Gardner be confined to serve his sentence at her home and that she would agree to act as a third-party custodian. ECF No. 44-1. She is also very direct about reporting to the BOP if Mr. Gardner does not follow home confinement rules. *Id.* Ms. Robinson has no criminal convictions and no member of her household has a criminal conviction. *Id.* No one in her home has ever contracted COVID-19 to her knowledge and Ms. Robinson states that all members of the household abide by the social distancing guidelines and that visitors are not allowed to enter the home. *Id.* Her home is also located close to Hurley Hospital in Flint. *Id.*

Considering these factors, requiring Mr. Gardner to serve his sentence in home confinement, where he can better protect himself from the COVID-19 pandemic, would not present a danger to the community.

### iv.   Section 3553(a) Sentencing Factors

A district court contemplating a motion for compassionate release must consider the § 3553(a) sentencing factors. These include the nature of the offense, the background and history of the defendant, and the need to "impose a sentence sufficient but not greater than necessary to comply with the purposes" of sentencing.  Those purposes of sentencing include the following:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

The Court's consideration of these factors is laid out both in this Order's analysis of U.S.S.G. § 1B1.13 and on the record of the January 24, 2019 sentencing hearing. To begin, there is no question that Mr. Gardner's drug crimes are serious. Moreover, he has a significant criminal history that includes several other drug trafficking crimes beginning in 1988, when he was 17, and continuing to the year 2000.  But

19

after being released in 2005 after his second sentence for a violation of supervised release, he had no serious criminal convictions until the instant offense in 2014.  And after being arrested for that offense, he was released pending further investigation and had no other criminal conduct and successfully complied with his bond conditions.

His background shows a history of criminal activity—he was qualified as a "career offender" under the sentencing guidelines—but most of that activity occurred when he was much younger man.  Since being arrested for the instant offense in 2014, Mr. Gardner has altered his conduct, and has avoided the kind of activity that he engaged in in his 20's.  In addition, during the time he has been in prison he has dedicated himself to developing educational and correctional tools to live a life apart from crime.

On the issue of deterrence, the government points out that if released, Mr. Gardner will have only served a year in federal prison, and that such a short period of time would not be a sufficient deterrent.  But at the same time there is not a particularly long time remaining on his sentence.  Mr. Gardner's projected release date is March 25, 2022 and he is eligible for home detention on October 19, 2021. ECF No 41, PageID.243. It may be true that serving out his entire sentence would have a greater deterrent effect, but a longer sentence would also have a greater potential for exposing a particularly vulnerable prisoner to the corona virus,  and the Court must weigh the value of deterrence against

increasing the threat of a possibly lethal infection.  In such a balance, deterrence weighs less.

As to the need to protect the public, given Mr. Gardner's significant and debilitating health conditions, he is unlikely to be in a position to commit further crimes if released.  Moreover, because he has a well-developed release plan, the Court can impose a period of home confinement as a condition of supervised release that will afford an additional protection to the public.

Having considered all of the § 3553 factors, and weighing them, defendant's alleged dangerousness, and the extraordinary and compelling circumstances presented by Mr. Gardner's multiple co-morbidities that make the corona virus more dangerous to him, the Court concludes that he has presented an adequate case in favor of granting compassionate release.

## IV. Conclusion

Because the BOP has sole authority over the place of a prisoner's imprisonment, the Court **DENIES** Defendant's Motion to Amend Sentence to Home Confinement. 18 U.S.C. § 3621(b). However, in finding that Mr. Gardner has a multitude of medical issues that place him at greater risk of death if he contracts COVID-19, and that he poses little threat of recidivism and that his home confinement will benefit public safety, the Court **GRANTS** Defendant's request for compassionate release.

The Court reduces Defendant's term of imprisonment portion of his sentence to time served, and orders that he immediately begin serving his originally imposed four (4) year term of supervised release. Judgment, ECF No. 29, PageID.129. As a condition of supervised release, Mr. Gardner must participate in the Global Positioning Satellite (GPS) technology of the Location Monitoring Program for a minimum of 180 consecutive days and abide by all the requirements of the program. Mr. Gardner is restricted to his residence, according to a curfew as directed by the probation officer. After 180 days, the probation department will notify the Court and determine if the Location Monitoring Program needs to be continued. Unless Defendant has been in a segregated special unit for high-risk prisoners for more than 14 days where no prisoner has tested positive or shown symptoms of COVID-19 within the past 14 days, the Court orders Defendant to self-quarantine within his home when he begins home confinement.

Accordingly,

**IT IS ORDERED** that Defendant's sentence of imprisonment is reduced to time served.

**IT IS FURTHER ORDERED** that the BOP shall release Defendant immediately, without holding him for a 14-day quarantine period at FCI Morgantown, and Defendant shall remain self-quarantined for 14 days after release.

**IT IS FURTHER ORDERED** that upon release, Defendant shall commence his originally imposed four (4) year term of supervised release. Judgment, ECF No. 29, PageID.129. As a condition of supervised release, Mr. Gardner must participate in the Global Positioning Satellite (GPS) technology of the Location Monitoring Program for a minimum of 180 consecutive days and abide by all the requirements of the program. Mr. Gardner is restricted to his residence, according to a curfew as directed by the probation officer. After 180 days, the probation department will notify the Court and determine if the Location Monitoring Program needs to be continued. **IT IS FURTHER ORDERED** that once the term of supervised release under home confinement begins, electronic location monitoring will commence as soon as the Probation Department can safely install the necessary electronic monitoring equipment and upon such other conditions as the Probation Department deems necessary.

**IT IS FURTHER ORDERED** that, within 24 hours of release from BOP custody, Defendant shall call the Probation Department to schedule an appointment.

**IT IS SO ORDERED**.
DATED: July 22, 2020.

BY THE COURT:


/s/Terrence G. Berg
TERRENCE G. BERG
United States District Judge

23